```
               UNITED STATES BANKRUPTCY COURT
              MIDDLE DISTRICT OF NORTH CAROLINA
                    WINSTON-SALEM DIVISION

IN RE:                          )
                                )
Cutting Edge Enterprises,       )   Case No. 07-50585C-11W
Inc.,                           )
                                )
          Debtor.               )
                                )
```

## MEMORANDUM OPINION

This case came before the court on July 5, 2007, for hearing on a Motion for Relief Relating to Automatic Stay (the "Motion") that was filed on behalf of the States of Alaska, Alabama, Arkansas, Arizona, California, Colorado, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, and Wyoming, and the Territory of Guam (collectively referred as the "States").

In the Motion, the States request the following: (1) that the court determine that two proceedings pending in state court in Maryland are not stayed by the section 362 automatic stay; (2) that the court determine that the automatic stay does not prevent the States from delisting a related company known as Alternative Brands, Inc. ("ABI") and the cigarette brands listed by ABI from certain directories for tobacco produce manufacturers and tobacco brands which are maintained by the States; and (3) that the court

determine that the States are not required by the automatic stay to approve certification requests filed by the Debtor and provide directory listings for cigarette brands that have been requested by the Debtor.

Having considered the Motion, the brief submitted in support of the Motion, the Debtor's objection and response in opposition to the Motion, the reply filed by the States, the affidavits and other documentary evidence submitted in support of and in opposition to the Motion and the arguments of counsel, the court has concluded for the reasons that follow that the Maryland proceedings are not subject to the automatic stay, that the automatic stay does not prevent enforcement proceedings against ABI, and that the States are not required to approve the directory listings requested by the Debtor to avoid a violation of the automatic stay.

BACKGROUND AND FACTS

1. The Master Settlement Agreement

In 1998, the four major domestic tobacco companies (Philip Morris, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp. and Lorillard Tobacco Company) entered into a Master Settlement Agreement ("MSA") with forty-six states (Florida, Minnesota, Mississippi and Texas had settled separately), the District of Columbia, and the five United States territories (American Samoa, Guam, the Northern Marianna Islands, Puerto Rico, and the Virgin Islands). Pursuant to the MSA, the States agreed to

dismiss the suits that were pending against the tobacco companies and release antitrust and other claims that had been asserted against those tobacco companies in exchange for perpetual payments that are directly related to each company's market share of the cigarette industry. Under the MSA, the funds are to be paid to the States and are supposed to be used to defray health costs resulting from smoking-related illnesses and to fund smoking prevention programs. The MSA also contains a number of advertising and marketing restrictions targeted at reducing smoking, particularly smoking by youths.

The MSA contains provisions under which other tobacco companies may enter into or join the MSA and become Subsequent Participating Manufacturers ("SPMs").[1] Pursuant to the terms of the MSA, all Participating Manufacturers ("PMs") make payments to the States (the "MSA payments") based primarily on the amount of cigarettes sold each year. The MSA payments are typically due by April 15th in the year following the calendar year for which sales were reported. Tobacco product manufacturers who chose not to participate in the MSA are known as Non-Participating Manufacturers("NPMs"). Because they are not parties to the MSA, NPMs do not make payments to the States under the MSA.

2.  The Qualifying and Complimentary Statutes

In order to receive the maximum benefits under the MSA, the

---

[1] Capitalized terms are terms defined under the MSA.

States are required by the MSA to enact legislation known as the Qualifying Statute. The Qualifying Statute requires, among other things, that NPMs make annual deposits into an interest bearing escrow account.[2] The escrow funds are to be used to pay any judgment or settlement of claims brought against the NPMs by the States. Some states have enacted additional legislation commonly known as complimentary statutes in order to provide for the enforcement of the Qualifying Statute against NPMs.[3]

The amount that NPMs are required to deposit into their escrow accounts is established under the Qualifying Statute and is based upon the NPMs' sales in the year preceding the date in which the payment is due. The amount that NPMs are required to deposit is now roughly equivalent to the amount that would be owed as MSA payments and operates to neutralize the competitive advantage NPMs otherwise would have over PMs if the PMs were the only ones making payments to the States. The funds deposited by NPMs must be held in the escrow account for 25 years so that if States successfully sue the NPMs on causes of action related to tobacco products, they may collect their judgments from the escrow accounts. At the end of 25 years, any remaining funds are returned to the NPM.

Under the complimentary statutes, NPMs must file a

---

[2] North Carolina Gen. Stat. §§ 66-290 through 291 is an example of the Qualifying Statute.

[3] North Carolina Gen. Stat. §§ 66-292 through 294.1 is an example of the complimentary statute.

certification every year with each of the states in which they sell cigarettes, in which the NPMs list their brands of cigarettes and, among other things, certify that they are maintaining the required escrow accounts and that they have placed the full amount of the required escrow deposits for the preceding year into the escrow accounts.

    3. The Directories and Listing of Brands.

Most of the States publish a directory of certified tobacco manufacturers. These directories list both the companies and the brands that the States determine to be compliant with either the terms of the MSA Contract, or the provisions of the Qualifying Statutes. The directories are published on websites maintained by the States. If an entity is not listed in the directory issued by a State, then under the complimentary statutes, wholesalers or distributors are prohibited from selling products of that entity in those states. The removal of an entity from the directories is referred to as delisting. Delisting occurs when a party is no longer qualified to have its cigarettes sold in a State and is removed from the State's directory.

In most States, PMs must certify their compliance with the provisions of the MSA on an annual basis. The process is more involved for NPMs, who must report in more detail (quarterly in some States and annually in most) the amounts paid into escrow for each different brand sold in each different state. Each of an NPM's

brands is evaluated on an individual basis for compliance with the Qualifying Statutes. If a PM is compliant with the terms of the MSA, or an NPM is compliant with the Qualifying Statute, then the company and all of its brands should be listed on the States' directories. If a company is non-complaint under either the MSA (as to PMs) or the Qualifying Statutes (as to NPMs), the company's name and its brands may be delisted and removed from the directories. As a practical matter, delisting means that a company will not be able to sell its cigarettes in the States in which it is delisted.

4. The Debtor and Related Entities

The Debtor, Cutting Edge Enterprises, Inc. ("Cutting Edge"), was incorporated in 1998 in Maryland. It has been a party to the MSA since December 22, 2000. After Cutting Edge became an SPM in 2000, it was listed in the directories that appeared on the States' websites, along with its brands, Makro and Emerald.

In March of 2005, the original owner of the stock of Cutting Edge sold his stock in Cutting Edge to Windy City Tobacco, LLC ("Windy City"). At the time of the purchase, all of Windy City's stock was owned by Scott Toth. Mr. Toth's purchase of the Windy City stock was financed by Calvin Phelps. Mr. Phelps is the owner of the stock of Renegade Holdings, Inc. which, in turn, owns all of the stock of Alternative Brands, Inc. ("ABI"). ABI is an established NPM and a federally licensed tobacco product

manufacturer.

Following the acquisition of the Cutting Edge stock by Windy City, Cutting Edge began to market the Dallas brand of cigarettes. Cutting Edge had no fabrication facility and the Dallas cigarettes marketed by Cutting Edge were produced by ABI pursuant to a fabrication agreement between the two companies.

When Cutting Edge first sought directory listing of its new cigarette brands with various States in March of 2005, a dispute with the States arose as to whether Cutting Edge was the "manufacturer" of the brands since it did not own a factory. Most of the States refused to list Cutting Edge's brands as MSA brands. Only the States of Arizona, Kentucky, Nevada (Dallas only), New Hampshire, and West Virginia agreed to list Dallas and Benton as Cutting Edge brands. According to Cutting Edge, the refusal to list Dallas and Benton effectively precluded nationwide sales of those brands and had adverse financial consequences for Cutting Edge.

On January 15, 2006, Scott Toth transferred his stock in Windy City to Calvin Phelps. This transfer apparently was precipitated by financial difficulties involving Cutting Edge and Windy City and was made in lieu of a foreclosure by Mr. Phelps.

Also on January 15, 2006, Renegade Tobacco, Inc. assigned the Tucson brand to Cutting Edge under an exclusive license agreement. Before the assignment, ABI held the license to and manufactured the Tucson brand and had filed NPM certifications with various States

to list Tucson on their directories as an ABI brand for purposes of the Qualifying Statutes. The Tucson brand apparently was a very successful brand and produced a substantial volume of sales for ABI before it was transferred to Cutting Edge.

    5.   Inability of Cutting Edge to List the Tucson Brand

Upon acquiring the Tucson brand from Renegade Tobacco, Inc., Cutting Edge, as an SPM, sought to list Tucson and several other brands as Cutting Edge brands pursuant to the MSA. These efforts gave rise to a further dispute between Cutting Edge and the States in which the States refused to list Tucson and the other new brands as Cutting Edge brands. The States took the position that the transfer of the stock of Cutting Edge to Windy City and from Windy City to Mr. Phelps did not comply with the MSA. Also according to the States, because ABI and Cutting Edge have the same investor controlling their shares, the two entities must be treated as if ABI (an NPM) were attempting to join the MSA Contract, thus requiring very large "back payments" based upon the number of Tucson cigarettes sold by ABI since the date of the MSA. Based upon this position, the States have continued to refuse to list Tucson as a Cutting Edge brand.

    6.   Double Listing of the 2006 Sales of Tucson

According to Cutting Edge, the refusal to list Tucson as a Cutting Edge brand posed a dilemma for Cutting Edge and ABI. Since Cutting Edge considered Tucson a Cutting Edge brand, Cutting Edge

reported the 2006 sales of the Tucson brand in order to remain compliant with the provisions of the MSA Contract and to preserve its position that Tucson is a Cutting Edge brand. Once it reported its sales of Tucson, however, Cutting Edge potentially became obligated to make MSA payments on the 2006 sales of Tucson by April 16, 2007. At the same time, in order to ensure that the States would not delist Tucson as an ABI brand under the Qualifying Statutes, ABI also reported the Tucson sales for 2006 pursuant to the Qualifying Statutes applicable to NPMs. Although ABI's certification to the States noted that the true owner of Tucson was Cutting Edge, Cutting Edge contends that when ABI reported the sales of Tucson, the States could then claim that the escrow Statutes required ABI to set aside escrow based on the 2006 Tucson sales. Cutting Edge maintains that this double listing of the Tucson sales has exposed Cutting Edge and ABI to the risk of double liability for the 2006 sales of Tucson, although the States now deny this. As a result of this perceived dilemma, neither Cutting Edge nor ABI made any payments for the Tucson cigarettes sold during 2006 pending a solution for the perceived double-liability dilemma. However, according to Cutting Edge, ABI is holding funds to be paid to the MSA fund by Cutting Edge as soon as its dispute with the States over interpretations of the MSA Contract are resolved. According to Cutting Edge, the disputes with the States, the refusal of the States to list Cutting Edge brands, the resulting financial problems

of Cutting Edge and the risk of double liability all combined to force Cutting Edge to file bankruptcy on April 16, 2007.

    7.   The Maryland Proceedings

When Cutting Edge filed its Chapter 11 case, two proceedings against Cutting Edge were pending in Maryland in the Circuit Court for Baltimore City. Both proceedings were filed by the Attorney General of the State of Maryland. The first proceeding was initiated by means of a motion seeking a determination that the transactions involving Cutting Edge, Windy City, ABI, and the Tucson brand violated the MSA. According to the motion, Cutting Edge violated Section XVII(c) of the MSA when it entered into the stock purchase agreement by which Windy City acquired 100% of the Cutting Edge stock and thereby effected a transfer of Cutting Edge's cigarette business. As a result, the motion asserts that the transfer of the stock of Cutting Edge to Windy City should be rescinded. The second proceeding in Maryland is a suit by the State of Maryland seeking a forfeiture of Cutting Edge's corporate charter. The suit alleges that Cutting Edge has "misused" its Maryland charter by virtue of its involvement in a fraudulent scheme to assist ABI in obtaining SPM status without the State's consent while avoiding the back pay obligations that it should be required to satisfy if it legitimately sought the benefits of SPM status. The suit asserts that the "public interest requires forfeiture of [Cutting Edge's] charter." According to the States, under the MSA,

the Circuit Court of Baltimore City is the venue with "exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree, and . . . shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State."

## ANALYSIS

1. The Applicability of the Automatic Stay
   to the Proceedings in Maryland

The parties do not dispute that a proceeding to determine whether the corporate charter of a debtor should be forfeited involves an attempt to exercise control over property of the bankruptcy estate within the meaning of section 362(a)(3). However, under section 362(b)(4), the automatic stay under section 362(a)(1), (3) or (6) does not apply to:

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police or regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental units police or regulatory power;

The key to a correct application of the exception embodied in section 362(b)(4) is to distinguish between situations in which a governmental unit acts pursuant to its police or regulatory power and situations in which the state acts merely to protect its status as a creditor. Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 865 (4th Cir. 2001). To make this distinction, a court must

look to the purpose of the law that the governmental unit is attempting to enforce and make the following evaluation:

> If the purpose of the law is to promote "public safety and welfare," <u>Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.)</u>, 128 F.3d 1294, 1297 (9th Cir. 1997), or to "effectuate public policy," <u>NLRB v. Edward Cooper Painting, Inc.</u>, 804 F.2d 934, 942 (6th Cir. 1986)(internal quotation marks omitted), then the exception applies. On the other hand, if the purpose of the law relates "to the protection of the government's pecuniary interest in the debtor's property, <u>Universal Life Church</u>, 128 F.3d at 1297, or to "adjudicate private rights," <u>Edward Cooper Painting</u>, 804 F.2d at 942 (internal quotation marks omitted), then the exception is inapplicable.

<u>Id.</u>

As pointed out in <u>Safety-Kleen</u>, a law may have a dual purpose of promoting the public welfare as well as protecting the state's pecuniary interest. In such a situation, the court "must determine the primary purpose of the law that the state is attempting to enforce" and if the primary purpose of the law is to promote the public welfare, then the exception in section 362(b)(4) is applicable even though the law also has a pecuniary purpose, as well. <u>Id.</u>

Both of the Maryland proceedings were brought by the State Attorney General on behalf of the State of Maryland and clearly constitute "an action or proceeding by a governmental unit" under section 362(b)(4). The only question that remains is whether they are proceedings to enforce the State of Maryland's police or

regulatory power. The court believes that this question should be answered in the affirmative.

The police and regulatory powers of the States are broad and embrace the government's power to preserve and promote the general welfare and health of the public. There are legitimate and serious public health and safety concerns related to the use of tobacco products and such concerns are well within the police and regulatory powers of the States. In bringing the tobacco suits and then entering into and structuring the comprehensive settlement that followed, the States obviously were acting to protect and promote public welfare and health and exercised their regulatory power in doing so. The MSA represents only one component of the settlement of massive litigation in which the States alleged that the tobacco companies had engaged in illegal and improper practices that had been detrimental to public health and welfare. The States not only sought monetary damages, but also sought declaratory and injunctive relief to prevent the alleged improper practices of the defendants and the continuing harm to the public health and welfare. See Star Scientific v. Beales, 278 F.3d 339, 344-45 (4th Cir. 2002). In obtaining the settlement that ended this litigation, the States insisted upon and obtained more than a contract requiring the payment of monetary damages. Judicial decrees were entered in all of the cases that approved and incorporated the MSA. These judicial decrees also ordered that the tobacco companies (1) refrain from

targeting youth in the advertising and marketing of tobacco products; (2) refrain from using cartoon characters to promote cigarette sales; (3) limit tobacco brand-name sponsorships of athletic and other events; (4) refrain from lobbying Congress to preempt or diminish the States' rights under the MSA or to advocate that settlement proceeds under the MSA be used for programs other than those related to tobacco or health; (5) dissolve the Tobacco Institute, the Council for Tobacco Research, and the Center for Indoor Air Research; and (6) refrain from suppressing research relating to smoking and health and misrepresenting the dangers of using tobacco products.

The settlement also included the formulation and incorporation of the model Qualifying Statute to augment the settlement. Most, if not all, of the States enacted the Qualifying Statute following the settlement. The Qualifying Statute contains detailed provisions that further regulate the sale of tobacco products and the companies that wish to market tobacco products to the public. For example, a tobacco product manufacturer cannot sell tobacco products in a State unless (1) it joins the MSA and becomes a Participating Manufacturer under the MSA or (2) agrees to fund an escrow account in the manner provided in the Qualifying Statute.[4] The enactment of these statutes clearly involved an exercise of the police power of

---

[4] An example of this section of the Qualifying Statute is North Carolina Gen. Stat. § 66-291(a).

the States in order to regulate tobacco companies and the marketing of tobacco products. Unless a manufacturer chooses to escrow, joining the MSA is a prerequisite to a manufacturer selling tobacco products to consumers. The MSA thus is an integral part of the regulatory regimen adopted by the States and should not be viewed in isolation. The MSA, the consent decrees and the accompanying statutes have the intertwined purpose of regulating and reducing the incidence of smoking in the States and thereby promoting public health. While there are monetary components to the tobacco settlement, the monetary components are not the primary aspects of the settlement. Therefore, even though the MSA is a contract, as asserted by Cutting Edge, it does not follow that the MSA should be excised from the comprehensive regulatory structure in place in Maryland and the enforcement proceeding viewed as merely a breach of contract action. Nor does the enforcement proceeding involve an effort by the State to establish or protect a pecuniary interest in any property of Cutting Edge. To the contrary, reversing or setting aside the stocks transfers that have been challenged by the State of Maryland is a regulatory action by the State and as such falls within the exception contained in section 362(b)(4). The same applies with equal force to the forfeiture action. The determination by a State of whether its grant of the privilege of a corporate charter has been abused to the extent of requiring forfeiture is a police and regulatory decision with no direct

monetary benefits to the State. Thus, the forfeiture action likewise falls within the exception created by section 362(b)(4). The result is that neither of the Maryland proceedings are subject to the automatic stay.

    2.   Status of Enforcement Actions
         against Alternative Brands, Inc.

The issue raised as to ABI is whether the automatic stay under section 362(a) enjoins the States from implementing against ABI the enforcement provisions contained in the qualifying and complimentary statutes that have been adopted by the States. Those enforcement provisions include removing or delisting ABI and the brands certified by ABI from the directories prepared and made public by the States. While maintaining that the Tucson brand is owned by Cutting Edge, ABI has been listing the Tucson brand with the States and also has been marketing Tucson cigarettes as a result of the inability of Cutting Edge to do so. Cutting Edge contends that the Tucson brand is property of the bankruptcy estate and that the States therefore are stayed by section 362(a)(3) from exercising control over the Tucson brand by delisting it. The decisive factor, however, is not whether the Tucson brand is property of the bankruptcy estate, but whether the implementation of the enforcement provisions of the qualifying and complimentary statutes fall within the exception embodied in section 362(b)(4). The court is satisfied that such is the case. The adoption of the qualifying and complimentary statutes involved an exercise of the police power of

the States. While the payment of money is required by these statutes, the primary purpose of the statutes is to effectuate public policy. The payments are intended to have a deterrent effect upon NPMs in that they will increase the likelihood that they will not lose their escrow payments to suits by the States if they do not engage in deceptive or fraudulent behavior in selling and marketing their products. The escrow payments also serve to force NPMs to internalize the costs of their products as the Pms are required to do under the MSA, and thereby operate to preclude the NPMs from creating a pool of low-priced cigarettes that would encourage consumption in contravention of the States' public health goals. Accordingly, the court concludes that the implementation of the enforcement provisions contained in those statutes, including the removal of ABI and any brands listed by ABI from the directories maintained by the States, constitutes action to enforce the States' police and regulatory powers within the meaning of section 362(b)(4). It follows that such enforcement actions are not subject to the automatic stay in this case.

    3. Applicability of Automatic Stay to Cutting Edge's
       Certification Request

The complimentary statutes adopted by the States require that manufacturers who join the MSA must file annual certifications with the state attorney general that lists all of the manufacturer's brands. Most of these statutes require that the certifications be

filed by April 30th of each year.[5] These statutes then direct that the state attorney general prepare and make available for public inspection a list of the manufacturers that participate in the MSA and all brand families of each Participating Manufacturer that the manufacturer has identified in the certificate it filed with the attorney general.[6] Subsequent to the filing of this case, Cutting Edge apparently filed certifications with some of the States pursuant to the complimentary statutes which listed Tucson as a Cutting Edge brand. Consistent with their position regarding the 2006 certifications in which they refused to list Tucson as a Cutting Edge brand, the States have refused to include Tucson as a 2007 Cutting Edge brand. The refusal apparently is based upon the dispute regarding whether there was a valid transfer of the Tucson brand to Cutting Edge and the dispute as to whether Cutting Edge is the "manufacturer" of the brand since it has no manufacturing or fabricating facility. Reviewing and evaluating requests for inclusion on certification lists is a normal part of the States' regulatory processes under the complimentary statutes. Section 362(b)(4) shields those regulatory processes from the automatic stay such that the automatic stay neither prevents those regulatory processes nor mandates their outcome. See <u>Wilmer Wood Products Co.</u>

---

[5] An example of this type of statute is North Carolina Gen. Stat. § 66-294(a).

[6] An example of this type of statute is North Carolina Gen. Stat. § 66-294.1(a).

v. State of Maine, 128 B.R. 1 (D. Me. 1991).  Moreover, to the extent that having a brand listed on the States' certification lists is a property interest, it is a property interest that Cutting Edge has never possessed and did not possess when this case was filed. Hence, the controversy here does not involve a delisting and whether delisting would involve an attempt to exercise control over property of the bankruptcy estate in contravention of the section 362(a)(3) automatic stay.  Instead, in arguing that the effect of the automatic stay is to require the States to make the requested listing, Cutting Edge does not seek to retain a property interest or avoid interference with that interest, but rather seeks to create a property interest.  The automatic stay is broad and far reaching but does not extend that far.

CONCLUSION

Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure a separate order shall be entered setting forth the court's ruling with respect to the three issues dealt with in this memorandum opinion.

This 19th day of July, 2007.

_/s/ William C. Stocks_
WILLIAM L. STOCKS
United States Bankruptcy Judge

## PARTIES IN INTEREST

Cutting Edge Enterprises, Inc.
ATTN: Galvin A. Phelps, Pes.
4140 Clemmons Road
PMB #297
Clemmons, NC 27028

William J. Hunter, Jr., Esq.
1000 PNC Plaza
500 West Jefferson Street
Louisville, KY 40202

R. Bradford Leggett, Esq.
P.O. Drawer 5129
Winston Salem, NC 27113-5129

Alternative Brand, Inc.
321 Farmington Road
Monksville, NC 27028

Gregory B. Crampton, Esq.
P.O. Box 18237
Raleigh, NC 27619

Karen Cordry, Esq.
Natl. Assoc. of Attorneys General
2030 M. Street, NW 8th Floor
Washington, DC 20036

Samuel R. Maizel, Esq.
10100 Santa Monica Blvd,, Suite 1100
Los Angeles, CA 90067